**IN THE MATTER OF
ARBITRATION BETWEEN**

**ALTERA GROUP LLC**                                              **CLAIMANT**

**and**                                                                      **ARB No. 2025-10-1**

**BLUE LINE BIOLOGICS LLC**                                 **RESPONDENT**

### ARBITRATOR'S OPINION AND AWARD

**Arbitrator:**   The undersigned Arbitrator, Robert G. Anderson, was selected by the parties pursuant to the Commercial Arbitration Rules of the American Arbitration Association ("the AAA Commercial Rules").

**Appearances:**   Scott Newton and Brigid M. Carpenter of Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., appeared on behalf of Claimant.

Josh Weinfeld appeared *pro se* on behalf of Respondent.

### I.

The parties hereto, Altera Group LLC ("Claimant"), and Blue Line Biologics LLC ("Respondent"), bring on to arbitration a certain claim or demand filed by Claimant seeking payment from Respondent for certain unpaid invoices for products supplied by Claimant to Respondent under a Distribution Agreement ("the Agreement") entered into by the parties on or about May 12, 2025, and for associated charges related to Respondent's failure to remit any payment on the subject invoices for products provided by Claimant.   The original Statement of Claim from Claimant to Respondent reads in pertinent part as follows:

Claimant Altera Group, LLC ("Altera") and Respondent Blue Line Biologics, LLC , ("Blue Line), entered into a Distribution Agreement effective May 12, 2025 ("Agreement"), pursuant to which Altera appointed Blue Line as a non-exclusive independent distributor of certain products listed in Exhibit A to the Agreement. Pursuant to the terms of the Agreement, Blue Line was to purchase the products at the prices listed in Exhibit A to the Agreement as

-1-

**EXHIBIT A**

follows: 50% due and payable immediately upon receipt of an invoice from Altera and prior to shipment, with the balance due in 60 days.

Blue Line has received product shipments from Altera but has failed to make payments in accordance with the terms of the Agreement. Currently, Blue Line owes Altera the purchase price and interest totaling $734,092.08 for product that has been received but not paid for. Thus, Blue Line has breached the Agreement and caused Altera damages.

Based on the foregoing, Altera makes a claim against Blue Line in the amount of $734,092.08, plus its reasonable attorneys' fees and expenses incurred in connection with the collection of such amount.

Based upon Claimant's oral motion at the arbitration hearing to submit an amendment to its Statement of Claim, which was granted by the Arbitrator, Claimant submitted an Amended Statement of Claim which reads in pertinent part as follows:

Altera incorporates the original Statement of Claim herein and states that the total amount currently due from Blue Line under the Agreement, including purchase price and interest, is $754,841.17. Altera seeks this amount plus its attorneys' fees and expenses incurred in connection with this arbitration.

Prior to moving the matter forward to arbitration, Claimant forwarded a Demand for Payment to Respondent on or about August 21, 2025. When no payment was made, Claimant then forwarded a Demand for Arbitration to Respondent on October 17, 2025, seeking to move this dispute forward to arbitration. On or about October 31, 2025, both parties consented to the undersigned serving as the Arbitrator to decide this matter.

After having been selected to serve as the Arbitrator in this matter, the undersigned Arbitrator entered an initial Arbitrator's Order Setting All Pre-Hearing Deadlines in Case, dated November 5, 2025, specifying that the arbitration hearing would proceed on December 5, 2025, in Hinds County, Mississippi. Following Claimant's Motion to Continue filed on December 2, 2025 – to which Respondent did not object – the Arbitrator entered his Order Continuing Arbitration Hearing Date to January 9, 2026. The Arbitrator then conducted a hearing on January 9, 2026, and now issues this his Opinion and Award pursuant to AAA Rule R-48.

-2-

**II.**

The following contractual provisions from the Distribution Agreement between the

parties ("the Agreement") are deemed relevant:

> This Distribution Agreement (the "Agreement") is made and entered into as of 05/12/2025 (the "Effective Date") by and between Altera Group, LLC ("**Altera**") located at 109 East 17th Street, Suite 490, Cheyenne, Wyoming 82001 and Blue Line Biologics LLC ("**Distributor**") located at 525 Country Line Rd #10 Lakewood NJ 08701.

### 3. PRODUCTS AND PAYMENTS

**Section 3.1    Products and Pricing.**   Distributor will purchase certain products from Altera at the Prices. The Products and corresponding Prices as of the Effective Date are set forth in Exhibit A. Altera may revise the Products and Prices listed on Exhibit A upon twenty (20) business days' prior notice to Distributor. All Prices are in U.S. dollars and are exclusive of all sales, use and excise taxes, and any other similar taxes, duties and charges of any kind imposed by any governmental authority on any amounts payable by Distributor under this Agreement. Distributor is responsible for all such charges, costs and taxes. Except to the extent that different payment terms are expressly set forth in Exhibit A, Distributor is to make all payment in U.S. dollars by bank wire or ACH transfer to an account designated by the Company, or by Credit Card. Payment terms are: 500 sq cm virtual bank, one half (i.e., 50%) of the purchase Price shall be due immediately upon receipt of an invoice from Altera and prior to shipment, and balance of the purchase Price net 60 days.

**Section 3.2    Payment: No Setoff.**   If any invoice is not paid when due, interest will be added and payable on all overdue amounts at ten percent (10%) per annum, except to the extent that a different interest rate is set forth on Exhibit A, and Distributor shall pay all costs of collection, including, without limitation, reasonable attorneys' fees. Distributor will perform its obligations under this Agreement without setoff, deduction, recoupment, or withholding of any kind of amounts owed or payable by Distributor.

**Section 4.3    Inspection.** Distributor will inspect Products received under this Agreement within ten (10) business days of receipt of the Products (the "**Inspection Period**") and either accept or, if any Products are nonconforming Products or excess Products, reject such nonconforming or excess portion of the Products delivered. Distributor will be deemed to have accepted the Products except to the extent that it expressly notifies Altera of certain nonconforming Products or excess Products prior to the expiration of the Inspection Period and

-3-

furnishes written evidence or other documentation as reasonably required by Altera. Products not expressly rejected prior to the expiration of the Inspection Period will be deemed accepted.

**Section 4.4    Title and Risk of Loss.** Title to Products shipped under any Sales Order and the risk of loss to Products shipped under any Sales Order will pass to Distributor immediately on Altera's delivery of such Products to the carrier.

**Section 5.3    Roles of the Parties.** The parties acknowledge and agree that neither party shall bill payors for the Products, nor perform any application of the Products. Distributor shall ensure that its contracts and communications with End Users indicate that (i) End Users shall be responsible for the application of the Products and interfacing with patients with respect to questions or concerns regarding the Products, (ii) Altera assumes no responsibility for payor coverage determinations, medical record documentation, medical necessity determinations, or the proper billing of the Products, all of which shall be and remain the sole domain and responsibility of the respective End Users, and (iii) there is no intent by the parties to induce or incentivize referrals from End Users and End Users will have no obligation to make referrals to Altera, Distributor, or any affiliate thereof.

## 9. ADDITIONAL TERMS

**Section 9.1    Entire Agreement.** This Agreement constitutes the entire agreement between the Parties with respect to its subject matter and supersedes all prior agreements between the Parties, whether written or oral, relating to the same subject matter. No modification, amendments or supplements to this Agreement shall be effective for any purpose unless in writing and signed by the Parties, except changes to Exhibit A and Exhibit C which may be made by Altera from time to time as described herein.

**Section 9.2    Arbitration.** Any controversies or disputes arising out of or relating to this Agreement shall be resolved by binding arbitration in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association. The Parties shall endeavor to select a mutually acceptable arbitrator who is knowledgeable about issues relating to the subject matter of this Agreement. In the event the Parties are unable to agree to such a selection, each party will select an arbitrator and the arbitrators selected by the Parties shall in turn select a third arbitrator. The arbitration shall take place in Hinds County, Mississippi, USA, or at such other location as mutually agreed upon by the Parties.

The arbitrator(s) shall not have the authority, power or right to alter, change, amend, modify, add [to] or subtract from any provision of this Agreement or to award punitive damages. The arbitrator(s) shall have the power to issue

-4-

mandatory orders and restraint orders in connection with the arbitration. The award rendered by the arbitrator(s) shall be final and binding on the Parties, and judgment may be entered thereon in any court having competent jurisdiction. The agreement to arbitrate contained in this section shall be specifically enforceable under the prevailing arbitration law. During the continuance of any arbitration proceeding, each Party shall continue to perform its respective obligations under this Agreement.

**Section 9.3      Governing Law**. The laws of the State of Mississippi shall govern this Agreement without regard to or application of choice of law rules or principles.

The Arbitrator also notes the following language from Exhibit A as referenced in the Agreement entered into by Claimant and Respondent.

**Exhibit – Product Listing**

**Product Name Q CodePrice (per cm²) Payment Terms**

| Product Name | Q Code | Price (per cm²) | Payment Terms |
|---|---|---|---|
| AmnioAmp | Q4250 | $400.00 | 50% down, balance due in 60 days |
| AmnioMaxx | Q4239 | $450.00 | 50% down, balance due in 60 days |
| Derm Max | Q4238 | $350.00 | 50% down, balance due in 60 days |

## III.

### A.      Claimant's Case

At the arbitration hearing on January 9, 2026, the Claimant called a single witness, Dan Schneider, who testified that he is employed as President of Altera.   Schneider further explained the Distribution Agreement negotiated by the parties, which was admitted in evidence as Claimant's Exhibit 1. Referring to the Agreement, Schneider pointed out a number of the provisions which are referenced above, such as Section 3.1 on pricing and Section 4.4 on Title and Risk of Loss, along with Section 5.3 which describes the respective roles of the parties.

In response to a question from the Arbitrator, Schneider explained that Altera sells certain wound care products that are synthetic skin or similar products used to treat burn patients and

-5-

patients with other injuries requiring skim replacement or repair. He described the Distribution Agreement as a "stock and bill" arrangement between Altera and its distributor, Blue Line, the Respondent in this case.

The Arbitrator notes that such "stock and bill" arrangements or "consignment closet" arrangements are well-known in the durable medical equipment context. They generally involve a durable medical equipment supplier storing items at a hospital, physician's office, nursing home or other type of facility at which patients receive treatment. Generally, a physician will prescribe the durable medical equipment for a patient and, if the patient agrees to use the DME supplier who is stocking product at the facility, the facility employee will then pull the item "out of the closet" so to speak and provide it to the patient.

The Arbitrator notes this arrangement between Claimant and Respondent is not, strictly speaking, a "stock and bill" arrangement in the traditional DME context, but the analogy is accurate. Essentially, as the Arbitrator understands the arrangement, Claimant's company provides the product directly to Respondent and it is the Respondent who then "pulls it from the closet" in essence and provides it directly to the physician who has a patient in need of the product. Just as in the DME setting, the supplier would bill Medicare and Medicaid directly for the DME provided to the patient. In the arrangement between Claimant and Respondent, it is the physician/provider's responsibility to bill Medicare, Medicaid and other health care benefit programs for reimbursement once the product is provided to an end user.

Mr. Schneider testified that in the Agreement between the parties, Claimant takes orders directly from Respondent and ships those products to Respondent. Under Section 3.1 of the Agreement, Respondent is obliged to pay one-half (50%) of the purchase price immediately upon

-6-

receipt of an invoice from Claimant, with the balance (50%) due within 60 days. Schneider explained that while Respondent has ordered products several times from Claimant pursuant to the language of the Distribution Agreement, Respondent has never made any payment to Claimant since the origination of the Agreement on May 12, 2025.

Mr. Schneider also explained that the products in question have a five year "shelf life" so to speak and can be held by Respondent until needed by a physician with an end user patient in need of the product. Further, Mr. Schneider pointed out that Section 4.3 of the Agreement allows Respondent the right of inspection of the product shipped by Claimant and, if any product is deemed nonconforming or excessive (i.e., in excess of what Respondent ordered), Respondent may reject such nonconforming or excessive product. However, Section 4.4 of the parties' Agreement makes plain that title to the products shipped by Claimant and the risk of loss of products shipped by Claimant passes to Respondent immediately upon Claimant's delivery of the product to the carrier for delivery to Respondent. The Agreement also specifies at Section 5.3 that "Altera assume no responsibility for payor coverage determinations. . . ."

Mr. Schneider further testified that Claimant's Exhibit 2, admitted in evidence as a collective exhibit, represents all of the products for which Respondent has been billed by Claimant during the existence of the Agreement. The invoices in question are dated from May 12, 2025, the inception date of the Agreement, through July 24, 2025. Claimant provided all of the products and shipped the products reflected in all these invoices to Respondent, but each and every one of the invoices remains unpaid by Respondent. In a text exchange between Schneider and Josh Weinfeld at Respondent, Weinfeld indicated "Will do today" on June 27, 2025, in response to a request to "Please pay all outstanding payments." *See* Claimant's Exhibit 3. When

-7-

Respondent had still ceased to pay any of its outstanding invoices, Claimant cancelled an order on or about August 1, 2025. Further, in response to a demand from counsel for Claimant seeking payment of outstanding invoices, Weinfeld suggested that the product is "defective" because it is not being reimbursed by the Medicare Administrative Contractor ("MAC") when billed by Respondent's company. *See* Claimant's Exhibit 4.

Mr. Schneider concluded his testimony by offering a document confirming that Claimant's product, AmnioAMP-MP, is fully billable for Place of Service 32, which encompasses skilled nursing facilities, across all Medicare Administrative Contractors nationwide. *See* Claimant's Exhibit 5. The AmnioAMP-MP product is billed using HCPCS Code Q4250, as specified in Exhibit A to the parties' Agreement. Thus, Mr. Schneider concluded, Claimant is due $754,841.17 as well as attorneys' fees and all costs of collection from Respondent for all products supplied to Respondent. In this respect, Mr. Schneider pointed out that Claimant has provided other products in addition to the Amnio-AMP product to Respondent, as to which Respondent has raised no objection or issue about reimbursement, yet Respondent has not paid a single one of the invoices received from Claimant.

## B.    Respondent's Case

Respondent called a single witness in its case, Mr. Josh Weinfeld. Weinfeld is apparently the individual who placed all of the orders with Claimant for the various products supplied to his company by Claimant. Weinfeld testified that, in his experience, payment is usually not due until the distributor (Respondent) is paid. Thus, he stated, he should have been allowed to await billing of various health care benefit programs – *and* reimbursement by them – before he was obliged to pay Claimant for the product they had supplied to him. Moreover, Weinfeld described

-8-

a reimbursement issue he is having with the Amnio-AMP product such that his company is not being able to obtain reimbursement for that product. Consequently, he testified, he considers the product supplied by Claimant to be a "defective product" because the manufacturer has not "arranged" for it to be reimbursed properly by various health care benefit programs, namely the Medicare Administrative Contractors.

On cross-examination, Mr. Weinfeld admitted that he had read and signed the Distribution Agreement and that he understood that the Agreement specifies his company is to pay 50% upon invoicing and 50% within 60 days. He also acknowledged the Title and Risk of Loss language which appears in Section 4.4 of the Agreement. Yet, he stated, the product is a defective product because Claimant did not properly obtain approval for the product to be reimbursable at Place of Service 32 (i.e., skilled nursing facilities).

The Arbitrator inquired of Mr. Weinfeld whether any of the physicians to whom he had supplied the products provided to him by Claimant had ever indicated to him that the product was not suitable for its intended purpose. Weinfeld replied, "No." In response to an inquiry about whether any patient had complained about the product or had to have it removed or replaced, again, Weinfeld testified "No." Lastly, Weinfeld confirmed that every end user to whom he has supplied the products provided to his company by Claimant has been able to make full use of the product. Yet, Weinfeld persisted in his view that the Amnio-AMP product was "defective" because at least one Medicare Administrative Contractor, National Government Services, is not reimbursing claims for the product.

In regard to other products for which there has *not* been a problem with reimbursement, yet Respondent has *not* paid his invoices from Claimant, Weinfeld explained that he "intended to

catch up on all the invoices" once he had the billing problem resolved with the Amnio-AMP product for which he says he cannot be reimbursed. In effect, he contended that once he gets paid on the "defective" product, he will catch up all his other invoices.

Weinfeld asked to submit a series of Explanation of Benefits ("EOBs") documents to show that claim were not being paid by the Medicare Administrative Contractor for the Amnio-AMP product billed under HCPCS Code Q4250. The Arbitrator held the record open and has received what has been marked as Respondent's Exhibit 1 from Mr. Weinfeld. This six-page document includes some discussion about why NGS (i.e., National Government Services), a Medicare Administrative Contractor, is denying Q4250 claims at Point of Service 31, which is the code for a skilled nursing facility. However, the last two pages of Respondent's Exhibit 1, the EOB portion, indicate that each of the claims was apparently billed at Place of Service *32*, which is the code for a nursing facility. Moreover, the EOB portion of Respondent's Exhibit 1 shows that of some $391,652.00 billed to National Government Services, the Medicare Administrative Contractor who received the claims, only $817.00 was allowed and only $648.72 was paid to the billing/performing provider. The Arbitrator is left to guess or surmise who was the billing/performing provider for the EOB portion of Respondent's Exhibit 1, since the document does not identify who, in fact, was the billing/performing provider on the claims in question. Presumably, the claims were billed by a physician or surgeon to whom Respondent provided the product and from whom Respondent expected to be paid but has not been paid. In any event, Respondent's contention is that until this billing issue is resolved, no payment is due Claimant and no interest should have accrued on the unpaid invoices. In short, Respondent claims that it does not presently owe Claimant anything due to the billing issue with Amnio-AMP.

-10-

## IV.

Without question, this matter is a rather simple and straightforward dispute about unpaid invoices submitted by Claimant to Respondent and the associated charges owed by Respondent for all of the products provided by Claimant. The Claimant, Altera Group LLC, has detailed for the Arbitrator the sums due and owing under the Distribution Agreement, which was signed by Josh Weinfeld as a representative and member of Respondent, Blue Line Biologics LLC.  For his part, Mr. Weinfeld by his own testimony acknowledges that he and his company received both the products shipped to his company and the corresponding invoices for same from Altera which make up Claimant's Exhibit 2. He simply asks to be relieved of the plain obligation he and his company undertook to pay one-half of the amount invoiced "immediately upon receipt of an invoice from Altera and prior to shipment, and the balance of the purchase Price net 60 days." Yet, such payment is precisely what Section 3.1 of the Distribution Agreement requires of Blue Line.

Unfortunately, the Arbitrator's authority – as is true of any arbitrator – is limited to the four corners of the Agreement, as he is specifically denied any "authority, power or right to alter, change, amend, modify, add or subtract from any provision of this Agreement. . . ." *See* Section 9.2 of the Agreement. This is significant because in the Agreement struck by the parties, the plain language specifies that Blue Line *will pay* "one half (i.e., 50%) of the purchase Price . . . immediately upon receipt of an invoice from Altera . . . and the balance of the purchase Price net 60 days." *See* Section 3.1 of the Agreement. The Agreement does not state that Blue Line will pay when it receives payment from a physician, end user, or any other payor. More importantly still, although the Agreement provides Respondent a right of inspection at Section 4.3 – a right

-11-

which Blue Line never exercised during the period it was receiving products from Altera – the Agreement plainly transfers title to the products shipped and places the risk of loss on Blue Line once the product is delivered to a carrier, as Section 4.4 makes abundantly clear.

Nowhere within the four corners of the Distribution Agreement does the Arbitrator find any language to support Respondent's "defective product" argument in this case. In short, the Respondent has offered no defense to the Demand and the Amended Statement of Claim advanced by Claimant in this arbitration proceeding. On the record made before me, Claimant has met its burden of proof that the Demand and Amended Statement of Claim are due to be honored.   That being the case, the Arbitrator is left with no alternative but to enforce the plain and unambiguous terms of the Agreement and to enter an Award in favor of Claimant.

## AWARD

The Arbitrator finds on the basis of the record and evidence in favor of the Claimant, Altera Group LLC on its Amended Statement of Claim filed in this action.

ACCORDINGLY, the Arbitrator finds that Respondent, Blue Line Biologics LLC, is liable for a total amount of $754,841.17, which includes accrued interest at the rate of 10.0% per annum. This Award shall continue to bear interest at the rate of 10.0% per annum until paid in full by Respondent.

IT IS THE FURTHER finding of the Arbitrator that Respondent is liable for and is ordered to pay Claimant for all costs associated with this arbitration proceeding, including the Arbitrator's costs as set forth in his invoice, as such costs constitute part of the costs of collection authorized under Section 3.2 of the Agreement. A copy of the Arbitrator's statement will be attached to the Opinion and Award and is incorporated herein by reference. The Arbitrator

-12-

directs that Claimant pay the Arbitrator's invoice and collect those costs from Respondent as part of the Award rendered herein.

IT IS FURTHER ORDERED AND ADJUDGED that Respondent shall pay Claimant its reasonable attorneys' fees in the amount of $48,169.50 and costs in the amount of $1,836.90 as such attorneys' fees and costs are further authorized under Section 3.2 of the Agreement.[1]

IT IS FINALLY ORDERED AND ADJUDGED that judgment on this Opinion and Award may be entered and enforced in any court having competent jurisdiction as set forth in Section 9.2 of the parties' Distribution Agreement.

SO ORDERED AND ADJUDGED this ___5th___ day of February, 2026.

_____
**ROBERT G. ANDERSON**
**Arbitrator**


*Contact Information for the Arbitrator:*

Robert G. Anderson, Arbitrator and Mediator
Anderson Law Group, PLLC
P.O. Box 1483
Madison, MS   39130-1483
Telephone:   (601) 605-2529
E-mail:   andersonlawpllc@comcast.net

---

[1]Redacted copies of Claimant's attorneys' fees and expenses submitted to the Arbitrator by Claimant's counsel are being forwarded to Respondent. The Arbitrator has reviewed said attorneys' fees and expenses and finds them to be reasonable and properly included within the Award made herein.

-13-

# ANDERSON LAW GROUP, PLLC

**February 5, 2026**

## STATEMENT OF ARBITRATOR'S FEES - REFERENCE ARB NO. 2025-10-1

Matter: Altera Group LLC v. Blue Line Biologics LLC

| DATE | ACTION OR EXPENSE | AMOUNT |
|---|---|---|
| November 4, 2025 | 1/2 Day for Initial Review of Case and Entry of Order Setting Initial Telephonic Status Conference | $ 600.00 |
| November 6, 2025 | 1/2 Day for Preparing to and Conducting Initial Telephonic Status Conference and Preparing/ Entering Order Setting All Pre-Hearing Deadlines In Case | $ 600.00 |
| November 17-21, 2025 | 1/4 Day for Review of Statement of Claim, Telephone Conference with Respondent, and Issuing Notice of Arbitration Hearing Location | $ 300.00 |
| December 2, 2025 | 1/4 Day for Receipt and Initial Review of Claimant's Motion to Continue Arbitration Hearing and Enter Order Continuing Hearing | $ 300.00 |
| January 9, 2026 | 1/2 Day Preparing for and Conducting Arbitration Hearing at Jackson, MS | $ 600.00 |
| **Expense Item:** | Arbitration Hearing Room Rental Charge | $ 333.00 |
| January 15, 2026 | 1/4 Day for Receipt and Review of Respondent's Exhibit 1 and Associated Research on HCPCS/POS Codes | $ 300.00 |
| January 30-31, 2026 | 2 Days for Arbitrator's Review of Entire Record And Preparation of Arbitration's Opinion and Award | $ 2,400.00 |

**223 W. Porter Street**
**Ridgeland, MS 39157**

**Post Office Box 1483**
**Madison, MS 39130-1483**

**Robert G. Anderson**
**Attorney at Law***
**Arbitrator and Mediator**

**(601) 605-2529 (office)**
**(601) 898-8383 (fax)**
**E-mail: andersonlawpllc@comcast.net**

**\* Licensed in Mississippi and Tennessee**

| DATE | ACTION OR EXPENSE | AMOUNT |
|---|---|---|
| February 3, 2026 | 1/4 Day Reviewing Claimant's Statement Of Legal Fees and Expenses | $  300.00 |

**TOTAL AMOUNT NOW DUE**          **$5,733.00**

Submitted this **5th** day of February, 2026.

_Robert G. Anderson_
**ROBERT G. ANDERSON**
**Arbitrator**

*REMIT PAYMENT TO:*          **ANDERSON LAW GROUP, PLLC**
**P.O. BOX 1483**
**MADISON, MS 39130-1483**

**223 W. Porter Street**
**Ridgeland, MS  39157**

_____
**Post Office Box 1483**
**Madison, MS  39130-1483**

**Robert G. Anderson**
**Attorney at Law***
**Arbitrator and Mediator**

**(601) 605-2529 (office)**
**(601) 898-8383 (fax)**
**E-mail:  andersonlawpllc@comcast.net**

**\* Licensed in Mississippi and Tennessee**