Docusign Envelope ID: 242EFF34-69D3-4DF1-9507-0767D73BC4CF

Privileged and Confidential Attorney Work Product
December 10, 2024

**DISTRIBUTION AGREEMENT BETWEEN**
**ALTERA GROUP LLC**
**AND**

_____

This Distribution Agreement (the "Agreement") is made and entered into as of <u>05/12/2025</u> (the "Effective Date") by and between Altera Group, LLC ("**Altera**") located at 109 East 17th Street, Suite 490, Cheyenne, Wyoming 82001 and <u>B l u e    L i n e    B i o l o g i c s    L L C</u> ("**Distributor**") located at <u>525 E. Country Line Rd #10 Lakewood NJ 08701</u>. Altera and Distributor may each be referred to individually as a "**Party**" and collectively as the "**Parties**."

## 1.  APPOINTMENT AS DISTRIBUTOR

**Section 1.1**    Altera hereby appoints Distributor, and Distributor accepts such appointment, to act as a non-exclusive independent distributor of certain Products in the Territory during the term, in accordance with the terms and conditions of this Agreement. For avoidance of doubt, Altera reserves the right to promote, market, distribute, sell, and otherwise dispose of the Products in the Territory, itself or with any other third Party. Distributor shall not, without the prior written consent of Altera: (a) appoint any subdistributor or other person to sell or distribute Products; or (b) sell Products to any person who Distributor knows or has reason to believe is not an End User. By accepting this appointment, Distributor agrees to comply with all Policies established and/or modified from time to time by Altera.

## 2.  GENERAL TERMS

**Section 2.1**    <u>**Definitions.**</u> The following capitalized terms shall have the following meanings for the purpose of this Agreement. Additional definitions may be found within the body of this Agreement.

A.       "**Applicable Law**" means all local, state, and federal laws, regulations, guidance, orders, and similar requirements applied by a governmental authority or regulatory agency applicable to either Party, including without limitation Health Care Laws.

B.       "**End User**" means an individual or entity that purchases Products from the Distributor for use by such individual or entity's patients for health care purposes.

C.       "**Health Care Laws**" means any health regulatory laws applicable to either Party, including, without limitation the federal Stark law; the federal False Claims Act, the federal Anti-Kickback Statute; the Health Insurance Portability and Accountability Act, as amended, and its implementing regulations ("**HIPAA**"); state health information privacy, sensitive condition, and consumer health data protection laws and regulations; the United States Food, Drug, and Cosmetics Act and its implementing regulations; the National Organ Transplant Act; state and federal government price reporting laws and regulations; the federal civil monetary penalties statute; and any similar state laws, and any regulations or guidance promulgated under any such federal or state laws.

1

# E X H I B I T   B

Privileged and Confidential Attorney Work Product
December 10, 2024

  D.  "**Policies**" means all quality standards and policies established and/or modified from time to time by Altera and published to Distributor, including without limitation the guidelines and requirements of Altera's compliance program and the Altera Code of Health Care Compliance attached hereto as Exhibit C.

  E.  "**Prices**" means the Price List in effect on the date that Altera accepts the related Sales Order.

  F.  "**Products**" means the products listed on Exhibit A, as updated by Altera from time to time upon prior written notice to the Distributor.

  G.  "**Price List**" means the prices listed on Exhibit A, as updated by Altera from time to time upon prior written notice to the Distributor.

  H.  "**Sales Order**" means written or electronic purchase orders or inventory requests for Products between Altera and the Distributor in a form acceptable to Altera.

  I.  "**Territory**" means the territory specified on Exhibit B.

**Section 2.2**  **Term.** This Agreement shall be effective as of the Effective Date and shall remain in effect for one (1) year. The Agreement will be renewed automatically for successive one (1) year terms unless terminated in accordance with the terms of this Agreement.

**Section 2.3**  **Termination**. This Agreement may be terminated by either Party at any time by giving the other Party ninety (90) days' prior written notice to the address set forth at the bottom of this Agreement. In the event that Distributor defaults in the performance of any of its obligations under this Agreement, including without limitation its obligations to comply with Policies and Applicable Laws, Altera may terminate this Agreement upon written notice at any time.

**Section 2.4**  **Obligations upon Termination**.  Any payments or other financial obligations pending at the time of termination will be due and payable within thirty (30) days of the date of termination of this Agreement.

### 3.  PRODUCTS AND PAYMENTS

**Section 3.1** **Products and Pricing**. Distributor will purchase certain products from Altera at the Prices. The Products and the corresponding Prices as of the Effective Date are set forth on Exhibit A. Altera may revise the Products and Prices listed on Exhibit A upon twenty (20) business days' prior notice to Distributor. All Prices are in U.S. dollars and are exclusive of all sales, use, and excise taxes, and any other similar taxes, duties, and charges of any kind imposed by any governmental authority on any amounts payable by Distributor under this Agreement. Distributor is responsible for all such charges, costs, and taxes.  Except to the extent that different payment terms are expressly set forth on Exhibit A, Distributor will make all payments in U.S. dollars by bank wire or ACH transfer to an account designated by the Company, or by Credit Card. Payment terms are: 500 sq cm virtual bank, one half (i.e., 50%) of the purchase Price and shall be due immediately upon receipt of an invoice from Altera and prior to shipment, and the balance of the purchase Price net 60 days.

4853-8048-2292v9

Privileged and Confidential Attorney Work Product
December 10, 2024

**Section 3.2   Payment; No Setoff**. If any invoice is not paid when due, interest will be added and payable on all overdue amounts at ten percent (10%) per annum, except to the extent that a different interest rate is set forth on Exhibit A, and Distributor shall pay all costs of collection, including, without limitation, reasonable attorneys' fees. Distributor will perform its obligations under this Agreement without setoff, deduction, recoupment, or withholding of any kind for amounts owed or payable by Distributor.

**Section 3.3    Pricing Terms**.

(a)   **True Price:** The pricing terms reflected in this Agreement constitute the true and correct prices charged to Distributor with respect to the Products, and are not subject to discounts, rebates, or any other modifications not reflected herein.

(b)   **Price Discrimination:** Distributor shall not engage in any form of price discrimination, including without limitation offering different prices to different customers for the same Product under substantially similar conditions. Any price discrimination shall be considered a violation of this Agreement and may result in termination of this Agreement.

(c)   **Compliance with Laws:** Distributor shall comply with all Applicable Laws and regulations regarding pricing, including without limitation antitrust laws, fair trade laws, and price discrimination laws.

**Section 3.4   Non-Circumvention**. Distributor covenants and agrees that it shall not, directly or indirectly, circumvent, interfere with, or solicit any existing clients, partners, sales representatives, or distributors of Altera.

## 4.   SHIPMENT AND DELIVERY

**Section 4.1   Shipment; Virtual Stock**. Unless expressly agreed to by the Parties in a Sales Order, Altera will select the method of shipment of and the carrier for the Products. Altera may make partial shipments of Products to Distributor. Each shipment constitutes a separate sale, and Distributor will pay for Products shipped, whether the shipment is in whole or partial fulfillment of a Sales Order. Notwithstanding any term or condition in any Sales Order, Altera is not obligated to ship any Product or other materials to Distributor under this Agreement or any Sales Order if Distributor is not in full compliance with all terms, conditions, and obligations of this Agreement. If expressly agreed in a Sales Order, Altera may stock Products on behalf of Distributor and ship such Products directly to End Users; provided, however, that: (a) the sale of Products to Distributor will be deemed to have occurred for all purposes immediately upon acceptance of a Sales Order; (b) in such event, five-eighths (i.e., 62.5%) of the purchase Price shall be due immediately upon receipt of an invoice from Altera and prior to shipment, and the balance of the purchase Price net 60 days, except to the extent that different payment terms are expressly set forth on Exhibit A; (c) title to the Products (and risk of loss) will pass to Distributor immediately on Altera's delivery of such Products to the carrier; and (d) Distributor waives its right to inspect and/or return any such Products.

**Section 4.2   Delivery.** Unless expressly agreed otherwise by the Parties in a Sales Order, Altera will deliver Products to the designated delivery point, using Altera's standard methods for

4853-8048-2292v9

Privileged and Confidential Attorney Work Product
December 10, 2024

packaging and shipping the Products.

**Section 4.3    Inspection**. Distributor will inspect Products received under this Agreement within ten (10) business days of receipt of the Products (the "**Inspection Period**") and either accept or, if any Products are nonconforming Products or excess Products, reject such nonconforming or excess portion of the Products delivered. Distributor will be deemed to have accepted the Products except to the extent that it expressly notifies Altera of certain nonconforming Products or excess Products prior to the expiration of the Inspection Period and furnishes written evidence or other documentation as reasonably required by Altera. Products not expressly rejected prior to the expiration of the Inspection Period will be deemed accepted. If Distributor timely notifies Altera of nonconforming Products or excess Products, the Parties will determine, in their reasonable discretion, whether such Products are nonconforming Products or excess Products. If the Parties determine that the Products are nonconforming Products or excess Products, Altera will: (a) if the Products are nonconforming Products, (i) replace the nonconforming Products with conforming Products, or (ii) refund the Price actually paid for the Nonconforming Products, less any applicable price concessions; or (b) if the Products are excess Products, (i) facilitate the prompt return shipment to Altera at Altera's sole cost and expense, or (ii) if requested by Distributor, permit Distributor to retain such excess Products at the standard Price less a credit in an amount estimated by Altera to constitute the equivalent of the return shipping fee avoided through Distributor's retention of the excess Products.

**Section 4.4    Title and Risk of Loss**. Title to Products shipped under any Sales Order and the risk of loss to Products shipped under any Sales Order will pass to Distributor immediately on Altera's delivery of such Products to the carrier.

**Section 4.5    Limited Right of Return; RMA Process**. All sales of Products to Distributor under this Agreement are made on a one-way basis and Distributor has no right to return Products purchased under this Agreement. If Altera seeks to replace nonconforming Products with conforming Products, Altera will accept a return of the nonconforming Products, so long as the return is made within fifteen (15) business days after the expiration of the Inspection Period and so long as such Products are returned in their original condition. To return nonconforming Products, Distributor will obtain a Return Merchandise Authorization ("**RMA**") number from Altera before shipping any such nonconforming Products. Altera will not accept a return of any Products without an RMA number. Altera will pay for all reasonable shipping and handling charges, without markup, on returned nonconforming Products and will bear the risk of loss during shipment.

**Section 4.6    Grant of Security**. To secure Distributor's obligations under this Agreement, Distributor hereby grants, assigns, and pledges to Altera a first priority security interest in all of Distributor's right, title, and interest in and to the Products sold by Seller to Distributor under the applicable Sales Order during the term, whether now owned or hereafter acquired or arising and wherever located, and in and to all proceeds thereof.  Distributor agrees, at its own expense, to promptly execute and deliver UCC-1 financing statements and such other instruments and agreements as Altera may request in order to provide Altera with a first priority perfected security interest in such Products and proceeds.  Distributor further agrees to perform all acts reasonably requested by Altera to establish, maintain, preserve, and protect the collateral, the lien granted to Altera herein, and the perfection and first priority of such lien.

4

4853-8048-2292v9

Privileged and Confidential Attorney Work Product
December 10, 2024

## 5.    GENERAL PERFORMANCE OBLIGATIONS AND COVENANTS

**Section 5.1    Distributor's Obligations**. Distributor will, in good faith and at its sole cost and expense: (a) prominently display "Authorized Distributor of Altera Group LLC" on each Product sold, according to promotion and marketing standards provided by or otherwise approved in writing by Altera; (b) have the sole responsibility for warehousing, invoicing, and billing its customers and providing order confirmations (if any) in accordance with Distributor's customary practices, and collecting receivables from its customers; (c) maintain and provide an organization of qualified, professional salespersons; and (d) maintain a place or places of business in the Territory, including adequate office, storage, and warehouse facilities and all other facilities as required for Distributor to perform its duties under this Agreement.

**Section 5.2    Marketing Obligations**. Distributor shall comply with Applicable Law and Policies with regard to all marketing communications performed in connection with this Agreement. Distributor shall use marketing or other promotional materials provided by or approved by Altera and shall not make any changes to modifications to the promotional materials without Altera's prior written consent. Distributor shall market, advertise, promote, and sell the Products to End Users located in the Territory consistent with good business practice and conduct its business in a manner that reflects favorably at all times on the Products and Altera's name, goodwill, and reputation.

**Section 5.3    Roles of the Parties**.  The parties acknowledge and agree that neither party shall bill payors for the Products, nor perform any application of the Products. Distributor shall ensure that its contracts and communications with End Users indicate that (i) End Users shall be responsible for the application of the Products and interfacing with patients with respect to questions or concerns regarding the Products, (ii) Altera assumes no responsibility for payor coverage determinations, medical record documentation, medical necessity determinations, or the proper billing of the Products, all of which shall be and remain the sole domain and responsibility of the respective End Users, and (iii) there is no intent by the Parties to induce or incentivize referrals from End Users and End Users will have no obligation to make referrals to Altera, Distributor, or any affiliate thereof.

**Section 5.4    Compliance with Laws and Policies**. Distributor will at all times during the term: (a) comply with all Applicable Laws related to Distributor's performance under this Agreement and all Polices established by Altera; (b) comply with all applicable industry standards related to Distributor's performance under this Agreement; (c) remain in good standing and maintain all certifications, credentials, licenses, and permits necessary to conduct its business relating to its obligations under this Agreement; and (d) provide reasonable assistance to Altera with respect to any applicable reporting requirements to governmental authorities, including the United States Food and Drug Administration and the United States Department of Health and Human Services. Without limiting the generality of the foregoing, Distributor will not act or fail to act in any way or engage in any transaction involving Altera, Altera's intellectual property rights, or the Products, including by way of marketing, promotion, advertising, the solicitation of the sale, lease, use, or otherwise, that violates any Applicable Laws.

The Parties agree to comply with and perform all of their obligations relating to the Products and this Agreement in accordance with all Applicable Laws, including without limitation all Health Care Laws and comply with the compliance programs instituted and set by Altera from time to time

5

4853-8048-2292v9

Docusign Envelope ID: 242EFF34-69D3-4DF1-9507-0767D73BC4CF

Privileged and Confidential Attorney Work Product
December 10, 2024

in its Policies, including the Altera Code of Health Care Compliance attached hereto as Exhibit C, as may be updated from time to time.  Distributor shall sign, and shall cause its representatives, agents, and employees to sign, Exhibit C promptly upon the execution of this Agreement and, with respect to Distributor's sales representatives, annually thereafter, and promptly upon the engagement of a new sales representative to work in connection with this Agreement.   If Distributor learns of any actual or potential violation of any Applicable Law by any representative, employee, or agent of Distributor, Distributor shall immediately notify Altera of the actual or potential violation and shall participate with Altera in pursuing any investigation and corrective action that Altera deems appropriate and necessary, including the removal of any such representative, employee, or agent from involvement in the performance of activities under this Agreement.

**Section 5.4   Compliance with Data Protection and Privacy Laws**. At all times during the term, Distributor and its representatives will: (a) not use or disclose any patient or consumer information, including without limitation information subject to HIPAA and/or any state data protection laws, other than as permitted or required by Applicable Law; (b) implement, maintain, and use appropriate security procedures, safeguards and practices to protect against any anticipated or actual threats or hazards to the security or integrity of patient or consumer information and prevent unauthorized access to, or use, destruction, modification, acquisition,  or disclosure of, patient or consumer information; (c) immediately report to Altera any actual or suspected unauthorized or improper access to, or destruction, modification, acquisition, use or disclosure of, or security incident potentially affecting, patient or consumer information (a "**Security Breach**"); and (d) mitigate any harmful effect that is known to Distributor or its representatives as a result of a Security Breach in violation of this Agreement or Applicable Law.   In the event that any Applicable Laws require that affected persons, the media or regulators be notified of a Security Breach, Distributor and its representatives shall reimburse Altera all costs incurred by Altera in connection with any legally required notice that Altera is required to make as a result of responding to or managing a Security Breach, and for the costs of any credit monitoring for affected persons as a result of such Security Breach. The remedies set forth herein shall be in addition to any other remedies available to Altera at law or in equity.   In furtherance of the obligations set forth in this section and to ensure compliance with Applicable Laws, if Altera determines in its sole discretion that the Distributor will be collecting, transferring, maintaining, processing, or otherwise using patient and/or consumer information in connection with this Agreement, the Parties will execute a Data Processing Addendum in such form as is reasonably requested by Altera.

**Section 5.5   Prohibited Acts**. Notwithstanding anything to the contrary in this Agreement, neither Distributor nor any of Distributor's representatives will: (a) engage in any unfair, competitive, misleading, or deceptive practices respecting Altera or the Products, including any product disparagement or "bait-and-switch" practices; (b) make any representation or warranty concerning the Products (including performance of the Products), Altera, or Distributor's engagement under this Agreement, including, without limitation, any representation or warranty contained on Distributor's website or other promotional materials, except to the extent such representation or warranty is authorized in writing by Altera or otherwise complies with the terms and conditions of this Agreement or written materials provided by Altera; (c) make any representation, warranty, guaranty, indemnity, claim, or commitment concerning the Products (including performance of the Products), Altera, or Distributor's engagement under this Agreement which are additional to or inconsistent with any then-existing representations, warranties, guarantees, indemnities, similar

6

Privileged and Confidential Attorney Work Product
December 10, 2024

claims, or other commitments in this Agreement or any online or written documentation made available by Altera to Distributor or any End User; (d) bind Altera to any contract, representation, understanding, act, or deed concerning Altera, the Products (including any related pricing or price concession terms), or any other service or product offered by Altera that is outside the scope of this Agreement; (e) market, advertise, promote, or solicit the sale of or refer potential customers to any person with respect to products that are in competition with the Products; (f) except as explicitly authorized in writing by Altera, service, repair, modify, alter, replace, reverse engineer, or otherwise change the Products; (g) make any representation to any person which conflicts with Altera's policies concerning pricing of the Products, (h) market or sell Products to any governmental authority or its respective agencies without the express written approval of Altera, or (i) engage in any acts or omissions, or make any representations or warranties that are prohibited under Exhibit C.

**Section 5.6    Confidentiality.** Distributor acknowledges that during the term of this Agreement, Distributor and its employees and other agents shall receive confidential information from Altera which may include without limitation trade secrets, business records, information about business relationships, intellectual property, and/or other information deemed confidential by Altera which the Distributor must guard against unauthorized disclosure.  In addition, the Parties agree that the terms and conditions of this Agreement shall remain confidential.  At no time during or after the termination of this Agreement, except as may be otherwise required by Applicable Law, shall Distributor, its representatives, employees, or agents disclose, communicate or divulge to, or use any information regarding the terms and conditions of this Agreement, or the business methods, business policies, procedures, techniques, or trade secrets, or other knowledge or processes of Altera made known to Distributor, its representatives, employees, or agents during the term of this Agreement, except as may be expressly authorized by Altera.

**Section 5.7    Altera's Right to Injunctive Relief.**  In the event of any threatened or actual unauthorized disclosure or use of Altera confidential information by Distributor, Altera shall be entitled to obtain immediate injunctive relief against the breach or threatened breach of Distributor's confidentiality obligations.  Such relief shall be in addition to, and not in lieu of, any other remedy for such breach available to Altera at law or in equity.  Notwithstanding the foregoing, the Parties agree that, to the extent required by Applicable Law, this Agreement may be provided to governmental entities if requested during an audit or investigation.

## 6.    INTELLECTUAL PROPERTY RIGHTS

**Section 6.1    Altera's Trademark License Grant**. Altera hereby grants to Distributor a non-exclusive, non-transferable, and non-sub-licensable license to use Altera's trademarks in the Territory during the term solely in connection with Distributor's marketing, advertising, promoting, and selling of the Products to prospective and existing customers. Distributor is authorized to refer to and advertise itself as an authorized distributor of the Products in the Territory and to use of the name "Altera Group LLC" in connection with its distribution and sale of the Products. Distributor immediately will discontinue the display or use of any trademark upon the expiration or termination of this Agreement or otherwise when requested by Altera. Other than the express license granted herein, Altera grants no right or license to Distributor, by implication, estoppel, or otherwise, to any intellectual property rights of Altera. In order to comply with Altera's quality control standards, Distributor will: (a) use Altera's trademarks in compliance with

7

4853-8048-2292v9

Docusign Envelope ID: 242EFF34-69D3-4DF1-9507-0767D73BC4CF

Privileged and Confidential Attorney Work Product
December 10, 2024

Applicable Laws and in conformance with any applicable trademark guidelines and Policies of Altera; and (b) not modify Altera's trademarks or other materials provided by Altera in any way and not use any of Altera's trademarks on or in connection with any goods or services other than the Products.

**Section 6.2    Altera's Ownership**. Distributor agrees and acknowledges that: (a) any and all of Altera's intellectual property rights are the sole and exclusive property of Altera; (b) Distributor will not acquire any ownership interest in any of Altera's intellectual property rights; (c) any goodwill derived from the use by Distributor of Altera's intellectual property rights inures to the benefit of Altera; and (d) Distributor will use Altera's intellectual property rights solely for the purposes of performing its obligations under this Agreement and only in accordance with this Agreement and the instructions of Altera.

## 7.  INDEMNIFICATION

**Section 7.1    Distributor's Indemnification**. Subject to the terms and conditions of this Agreement, Distributor will indemnify, defend, and hold harmless Altera and its affiliates and each of their respective officers, directors, partners, members, managers, shareholders, employees, agents, affiliates, successors, and permitted assigns (collectively, the "**Altera Indemnified Parties**") against any and all losses incurred by any of the Altera Indemnified Parties arising out of, relating to, or resulting from: (a) a material breach or non-fulfillment of any representation, warranty, agreement, obligation, or covenant of Distributor or any of its representatives under this Agreement or any Sales Order; (b) any act or omission of Distributor or any of its representatives (including any recklessness or willful misconduct) in connection with the performance of Distributor's obligations under this Agreement or any Sales Order; (c) any failure by Distributor or any of its representatives to comply with any Applicable Laws; or (d) any allegation that Distributor breached any agreement with a third party as a result of or in connection with entering into, performing under, or terminating this Agreement or any Sales Order.

**Section 7.2    Altera's Indemnification**. Altera will indemnify, defend, and hold harmless Distributor and its respective officers, directors, partners, members, managers, shareholders, employees, agents, successors, and permitted assigns (collectively, the "**Distributor Indemnified Parties**") against any and all losses incurred by any of the Distributor Indemnified Parties arising out of, relating to, or resulting from: (a) a material breach or nonfulfillment of any representation, warranty, agreement, obligation, or covenant of Altera under this Agreement or any Sales Order; (b) any act or omission of Altera or any of its representatives (including any recklessness or willful misconduct) in connection with the performance of Altera's obligations under this Agreement; or any failure by Altera or any of its representatives to comply with Applicable Laws. Notwithstanding anything to the contrary in this Agreement, this section does not apply to any claim (whether direct or indirect) for which a sole or exclusive remedy is provided for under another section of this Agreement.

**Section 7.3    Exceptions and Limitations on General Indemnification**. Notwithstanding anything to the contrary in this Agreement, no Party obligated to provide indemnification under this Agreement is obligated to indemnify or defend an indemnified Party against any claim (whether direct or indirect) if the claim or corresponding losses arise out of, relate to, or result from, in whole or in part, the indemnified Party's or its representative's: (a) gross negligence or

8

4853-8048-2292v9

Docusign Envelope ID: 242EFF34-69D3-4DF1-9507-0767D73BC4CF

Privileged and Confidential Attorney Work Product
December 10, 2024

act or omission (including recklessness or willful misconduct); or (b) bad faith failure to comply with any term, condition, obligation, or provision of this Agreement or Applicable Law.

**Section 7.4   Sole Remedy**. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, THIS ARTICLE SETS FORTH THE ENTIRE LIABILITY AND OBLIGATION OF EACH INDEMNIFYING PARTY AND THE SOLE AND EXCLUSIVE REMEDY FOR EACH INDEMNIFIED PARTY FOR ANY DAMAGES UNDER THIS AGREEMENT.

## 8.   LIMITATION OF LIABILITY

**Section 8.1   No Liability for Consequential or Indirect Damages**. EXCEPT FOR OBLIGATIONS TO MAKE PAYMENTS UNDER THIS AGREEMENT, LIABILITY FOR INDEMNIFICATION, LIABILITY FOR BREACH OF CONFIDENTIALITY OR PRIVACY OBLIGATIONS, OR LIABILITY FOR INFRINGEMENT OR MISAPPROPRIATION OF INTELLECTUAL PROPERTY RIGHTS, IN NO EVENT WILL ALTERA OR ITS REPRESENTATIVES BE LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES, OR DIMINUTION IN VALUE, ARISING OUT OF, RELATING TO, OR RESULTING FROM ANY BREACH OF THIS AGREEMENT, REGARDLESS OF: (A) WHETHER THE DAMAGES WERE FORESEEABLE; (B) WHETHER OR NOT THE BREACHING PARTY WAS ADVISED OF THE POSSIBILITY OF THE DAMAGES; AND (C) THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT, OR OTHERWISE) ON WHICH THE CLAIM IS BASED, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE.

**Section 8.2   Maximum Liability for Damages**. EXCEPT FOR OBLIGATIONS TO MAKE PAYMENTS UNDER THIS AGREEMENT, LIABILITY FOR INDEMNIFICATION, LIABILITY FOR BREACH OF CONFIDENTIALITY OR PRIVACY OBLIGATIONS, OR LIABILITY FOR INFRINGEMENT OR MISAPPROPRIATION OF INTELLECTUAL PROPERTY RIGHTS, IN NO EVENT WILL ANY PARTY'S AGGREGATE LIABILITY ARISING OUT OF, RELATED TO, OR RESULTING FROM THIS AGREEMENT, WHETHER ARISING OUT OF, RELATED TO, OR RESULTING FROM ANY BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, EXCEED THE TOTAL OF THE AMOUNTS PAID AND AMOUNTS ACCRUED BUT NOT YET PAID TO ALTERA UNDER THIS AGREEMENT.

## 9.   ADDITIONAL TERMS

**Section 9.1   Entire Agreement**. This Agreement constitutes the entire agreement between the Parties with respect to its subject matter and supersedes all prior agreements between the Parties, whether written or oral, relating to the same subject matter. No modification, amendments or supplements to this Agreement shall be effective for any purpose unless in writing and signed by the Parties, except the changes to Exhibit A and Exhibit C which may be made by Altera from time to time as described herein.

**Section 9.2   Arbitration.** Any controversies or disputes arising out of or relating to this Agreement shall be resolved by binding arbitration in accordance with the then current Commercial

4853-8048-2292v9

Docusign Envelope ID: 2425F534-69D3-4BF1-9507-0767D73BC4CF

Privileged and Confidential Attorney Work Product
December 10, 2024

Arbitration Rules of the American Arbitration Association. The Parties shall endeavor to select a mutually acceptable arbitrator who is knowledgeable about issues relating to the subject matter of this Agreement. In the event the Parties are unable to agree to such a selection, each party will select an arbitrator and the arbitrators selected by the Parties shall in turn select a third arbitrator. The arbitration shall take place in Hinds County, Mississippi, USA, or at such other location as mutually agreed upon by the Parties.

The arbitrator(s) shall not have the authority, power or right to alter, change, amend, modify, add or subtract from any provision of this Agreement or to award punitive damages. The arbitrator(s) shall have the power to issue mandatory orders and restraint orders in connection with the arbitration. The award rendered by the arbitrator(s) shall be final and binding on the Parties, and judgment may be entered thereon in any court having competent jurisdiction. The agreement to arbitrate contained in this section shall be specifically enforceable under the prevailing arbitration law. During the continuance of any arbitration proceeding, each Party shall continue to perform its respective obligations under this Agreement.

**Section 9.3   Governing Law.** The laws of the State of Mississippi shall govern this Agreement without regard to or application of choice of law rules or principles.

**Section 9.4   Force Majeure.** Notwithstanding any provision to the contrary, neither Party shall be liable for any loss, damage, claim or delay, change in shipment schedules or failure to deliver caused by a condition (for example, strikes, riots, fire, accidents, insurrection, war, the elements, embargoes, failure of carriers, inability to obtain raw materials, or transportation facilities, government actions, acts of God or the public enemy) that was beyond that Party's reasonable control.

**Section 9.5   Independent Contractors.** The Parties are independent contractors and do not intend to create under this Agreement an employment or agency relationship, joint venture, partnership, business association or other form of business entity. Except as otherwise provided herein, in no event shall Altera be liable in any manner for the acts and omissions of Distributor, Distributor's employees, representatives and agents, or persons or entities contracting with Distributor including without limitation, the failure of Representative to compensate its employees, representatives and agents.

**Section 9.6   Counterparts.** This Agreement may be executed in any number of counterparts, with each such counterpart constituting an original and all of such counterparts constituting but one and the same instrument.

**Section 9.7   Records.** Distributor will maintain inventory records for all Product inventory received hereunder. Inventory will be tracked by lot number, serial/any other required number, and expiration date. Distributor shall keep complete and accurate books and records pertaining to sales of Product, Prices, and price concessions, as applicable, which shall be made available for inspection within seven (7) days of written request by Altera. Books and records required to be kept pursuant to this Section shall be retained by Distributor for a period of time equivalent to the lifetime of the Product as defined by Altera, but in no circumstances less than ten (10) years from the date of Product use or sale, or as may be required by Applicable Law whichever is later.

4853-8048-2292v9

Docusign Envelope ID: 2425F534-69D3-4BF1-9507-0767D73BC4CF

Privileged and Confidential Attorney Work Product
December 10, 2024

**Section 9.8**  **Survival**.  The following terms and conditions will survive any termination of this Agreement: Sections 2.4, 4.6, 5.4, 5.5, 5.6, 5.7, and 5.8 and Articles 6, 7, 8, and 9.

*[Signature page follows.]*

11

4853-8048-2292v9

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Effective Date.

**ALTERA:**

**Altera Group LLC**

By:

Address:

625 Bakers Bridge Avenue, Suite 105, Box 246
Franklin, Tennessee 37067
Email: Dan@Alteragrp.com

**DISTRIBUTOR**

_____

By: _____

Print Name: Josh Weinfeld

Title: Member

**Address**:

Attn: 525 County line rd lkwd nj 087p1

_____

Email: josh@bluelinebiologics.com

\\

12

4853-8048-2292v9

## Exhibit A – Product Listing

| Product Name | Q Code | Price (per cm²) | Payment Terms |
| --- | --- | --- | --- |
| AmnioAmp | Q4250 | $400.00 | 50% down, balance due in 60 days |
| AmnioMaxx | Q4239 | $450.00 | 50% down, balance due in 60 days |
| Derm Maxx | Q4238 | $350.00 | 50% down, balance due in 60 days |

4853-8048-2292v9

Docusign Envelope ID: 2425F534-69D3-4DF1-9507-0767D73BC4CF

14

**Exhibit B**

**The Territory**

14

**Exhibit C**

**<u>Altera Code of Health Care Compliance</u>**

As a Distributor, you and your sales representatives are subject to Altera's Code of Health Care Compliance, as included for your reference in this Exhibit. By signing below, you acknowledge that you have received and agree to comply with the Code of Health Care Compliance and the laws and regulations described therein.

**Company:** <u>Blue line biologics llc</u>

**(Legal Entity Name)**

**Signed By:** _____

**Name:** <u>Josh Weinfeld</u>

**Title:** <u>Member</u>

**Email:** <u>josh@bluelinebiologics.com</u>

As a sales representative, you are subject to Altera's Code of Health Care Compliance, as included for your reference in this Exhibit. By signing below, you acknowledge that you have received and agree to comply with the Code of Health Care Compliance and the laws and regulations described therein.

**Signed By:** _____

**Name:** <u>Josh Weinfeld</u>

**Title:** <u>Member</u>

**Email:** <u>josh@bluelinebiologics.com</u>

15

Docusign Envelope ID: 2425F534-69D3-4DF1-9507-0767D73BC4CF

**ALTERA CODE OF CONDUCT AND COMPLIANCE PLAN**

4853-8048-2292v9